BETTY JEAN PECK v. DENNIS W. PECK, JR.

5-4910                              440 S.W. 2d 577

Opinion Delivered May 19, 1969

---

[1]The testimony reflected that the truck was first observed 150 feet away.

*Gladys Milham Wied* for appellant.

*Hall, Tucker & Lovell* for appellee.

CARLETON HARRIS, Chief Justice.    Betty Jean Peck, appellant herein, and appellee, Dennis W. Peck, Jr., were married on April 30, 1946.    Four children were born to this marriage, two presently being minors, Francis, age 16 years, and Thomas, age 15 years.    On May 17, 1963, appellee obtained an absolute divorce from appellant in the Chancery Court of Saline County, appellant signing a waiver and not appearing at the hearing.    Under the terms of the decree, appellee was awarded custody of the minor children and title to all property acquired by the parties during their marriage, except for an automobile, which had been previously delivered to appellant.    In September, 1963, the parties remarried, and lived together until September, 1968, at which time, Mrs. Peck instituted suit in the Saline Chancery Court for a divorce. The complaint alleged general indignities, systematically and continuously pursued, and also set out the ownership of certain property, including the home place, appellant contending that this property should be awarded to her for the use and benefit of the children, or in the alternative, that it be sold and the proceeds equally divided. She also sought custody of the minor children.    Appellee filed a cross-complaint, also seeking an absolute divorce on grounds of general indignities, and the custody of the

children, and denying all other allegations.    On hearing, the court dismissed appellant's complaint, granted appellee an absolute divorce upon his cross-complaint, decreed that appellant should have the automobile; vested title in the home place in appellee, subject to a mortgage indebtedness, which appellee was ordered to pay "and relieve plaintiff of any obligation to pay it;" directed that $800.00 be paid to appellant at the rate of $50.00 per month; awarded the custody of Francis Peck to appellee, and gave custody of Tommy to Mrs. Peck, conditioned, however, that Tommy, presently at the Arkansas Children's Colony, remain there so long as the Colony officials felt that he could be helped, and providing that, when Tommy was dismissed from the Colony, he should reside with his mother, and appellee should be responsible for his support.    From the decree so entered, appellant brings this appeal.    For reversal, it is first asserted that the court erred in awarding the divorce and custody of the minor daughter to Dennis Peck, Jr., there being insufficient evidence to sustain the decree.    It is then alleged that the court erred in not awarding appellant the divorce, in not giving her custody of both children, and in failing to award her asserted interest in the property.

Mrs. Peck's complaints were to the effect that if she were away from home, and arrived back a few minutes later than her husband thought she should, he would accuse her of being out with another man; that he would not go places with her; that he had struck her on several occasions, and would hold her in bed until she would go into hysterics.    Mrs. Peck was employed at Safeway. Her sister, aunt, and a fellow employee at Safeway, all testified in her behalf, but none observed any mistreatment by appellee.[1]

---

[1] The sister said that an altercation between the parties took place in the bedroom, and her sister came out "just crying and tore up."

Clyde Reaves said that appellee had told him that he had gotten angry with Mrs. Peck a few times, and had slapped her.

We think the preponderance of the testimony favors Mr. Peck. The daughter, Francis, testified that she had heard her father and mother argue many times, but she had not seen her father mistreat her mother. She said that she had never seen him strike her, and had observed no bruises or marks on appellant. Further, she said that her mother, on returning from a trip to Fort Smith. told her (Francis) that she, while in Fort Smith, had gone out with other men: "She didn't act like she was sorry about it." The daughter also stated that she had observed her mother kissing a neighbor, Max Prickett. Francis testified that she desired to live with her father.

Billy Peck, a son, who had been discharged from the Air Force, testified that his mother, after he had returned from service, told him that appellee had beaten her, but he was unable to observe any bruises. He said that his father had never struck his mother. Mr. Peck testified that he had complained to his wife about the neighbor (previously mentioned), and also had made complaint about Reaves' being around the house so much during his absence. He said there were instances when she had been away from home, and appellee would not tell him where she had been. Appellee denied striking Mrs. Peck, though he said he had "held her." According to his testimony, after the court had given temporary custody of the children to him, the wife had come to the house, and endeavored to find a gun for the purpose of killing the members of the family.

Eugene Hawley and Paul Ingles both testified that they had observed Reaves at the Peck home numerous times when Mr. Peck was away at work.[2]

_____

[2]Reaves testified: "I have been in the house many times when Mr. Peck wasn't at home having coffee with Mrs. Peck. I have

Steve Taylor, 25 years of age and a resident of Little Rock, who formerly lived next door to the Pecks, testified that on one occasion Mrs. Peck came to his mother's home with her clothes and hair "messed up," and had asked his mother to tell Mr. Peck that appellant had been at the Taylor home (as an alibi), appellant not having been there. He also said that appellant had "made passes" at him.

We are unable to say that the Chancellor's finding that appellee was entitled to a divorce was against the preponderance of the evidence, particularly when we consider the fact that he was in a position to observe all of the witnesses as they testified.

The record reflects that approximately one week prior to the first divorce between the parties, the house they were living in burned.[3] Apparently, on the same day (according to appellant's complaint) that the divorce was granted, Mrs. Peck executed a quitclaim deed, relinquishing all of her claim to the property which the parties had held as an estate by the entirety. The instrument was acknowledged before a Benton attorney. Thereafter, in August, 1963, according to the evidence, appellant and appellee received the sum of $10,500.00 from insurance which had been carried on the home, and the two entered into a building contract with Capital Savings and Loan Association, wherein the closing statement re-

---

asked Mr. Peck many times if he objected. His answer would be No, that he trusted me. I recall when Mr. Peck was ill last winter, I fed his hogs for him. I didn't mind. I have done tractor work with Mr. Peck and on many occasions I have been doing a few minutes work out on the property. Yes, I have been on the Peck property many times."

[3]The first divorce decree does not appear in the record before us, and the exact date cannot be definitely determined. In an amendment to her complaint, Mrs. Peck states the divorce was granted on May 23, 1963. In her statement of the case, she says that it was granted on May 17, 1963. Appellee, in his statement of the case, says that they were divorced on May 22, 1963.

flects that Dennis Peck, Jr., and Betty Peck, as wife, paid $7,684.28 as a down payment on the home to be constructed, and executed a mortgage on the property in the sum of $8,000.00. Mrs. Peck claims an equal interest in this property, stating that she was not aware of executing a deed conveying her interest. Her evidence on this point falls far short of establishing her contention. According to her testimony, appellant never ceased to live with appellee, though they were divorced from May, 1963, to September of the same year,[*] and she asserted in her amended complaint that she signed the waiver, and agreed to a divorce in order to enable Mr. Peck to sue a union official (with whom she had an affair before the first divorce) for alienation of affection. Appellant said that the only instrument she had ever signed was the waiver, executed on April 18, 1963; however, on cross-examination, she admitted that the signature on the deed was her own, but stated: "I didn't know I was signing a deed." But, when shown a copy of the divorce decree, and specifically a provision which recited that the court held that all properties acquired by the parties during their married life, except an automobile, should be granted absolutely to Mr. Peck, Mrs. Peck admitted that this had been the arrangement. From the testimony:

"Q. So you understood that when that divorce was rendered that all the property was going to Mr. Peck as well as custody of the children?

"A. That was the agreement we made."

Of course, though Mrs. Peck signed the mortgage as the wife of Mr. Peck, the parties were not married at the time, and appellee was the sole owner of the property. It may be that she signed in contemplation of the fact

---

[*]Mr. Peck denied that they had continued to live together, but Mrs. Derrick, a friend, supported appellant in this contention.

that they would later remarry, but this is not established by the record. It is pointed out that Mr. Peck never did record his deed, but this circumstance hardly supplies the necessary proof. The only facts established (from the testimony of appellant herself) are that she knew that she lost all interest in the home property when the first divorce was granted, and that she had agreed to this arrangement.

Affirmed.